# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JANE DOE,**

      **Plaintiff,**

**v.**                            **Case No.:  6:19-cv-1250-Orl-37GJK**

**FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY,**

      **Defendant.**
_____/

## <u>THE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant, **BOARD OF TRUSTEES FLORIDA AGRICULTURAL AND MECHANICAL UNIVERSITY** ("University"), through the undersigned counsel, and pursuant to Rule 56, Fed. R. Civ. P., and the Amended Case Management and Scheduling Order [ECF No. 76 at J] moves for summary judgment as to all claims brought against it by Plaintiff, **JANE DOE** ("Plaintiff").

### INTRODUCTION

The University is committed to providing adults who pursue academic opportunities an environment that is free from discrimination and harassment on the basis of sex. The unavoidable issue in this case is what did University personnel know about Plaintiff's sexual harassment and sexual abuse claims against Fells, when did they know it, and how did they respond when they received this information. As the timeline will show, the University was far from deliberately indifferent in response to this information. The University acted

expeditiously and followed its procedures that were in accordance with applicable law. Accordingly, Defendant's Motion for Summary Judgment should be granted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### I.   *Actual Notice Received by University on December 4, 2017*

1.     On December 4, 2017, Plaintiff visited Gary Harrington, the Director of Student Affairs, to request counseling services. [Ex. 49, p. 154:8-14; Ex. 30].

2.     According to Plaintiff, Harrington told her that he would not tell anybody what she was about to tell him. [Ex. 49, pp.155-56:2-23].

3.     During this meeting, Plaintiff, reluctantly, informed Harrington of "what was going on" between her and Fells. [Ex. 49, pp. 155-56:2-14]. Plaintiff stated that she intentionally left out some of the details regarding what went on between her and Fells, because "some stuff is just not people's business." *Id.*

4.     Plaintiff told Harrington that she felt that Fells helped get her into the College of Law. [Ex. 49, pp. 156-57:24-4].

5.     Plaintiff made it clear, however, that she did not want to file a complaint against Fells. [Ex. 49, p. 155:2-23].

6.     During their meeting, Harrington scheduled an appointment with a counselor from the Tallahassee main campus to contact Plaintiff that evening. [Ex. 47, p. 11:5-19; Ex. 49, p. 158:18-24].

---

[1] Because this court must construe the facts in the light most favorable to the Plaintiff, Defendant – for the purpose of summary judgment only – accepts Plaintiffs timeline regarding her interactions with Orenn Fells.

7.      Harrington offered to reschedule Plaintiff's contracts exam, which was scheduled for that night, but Plaintiff declined. [Ex. 49, pp. 155-56:24-14].

8.      Plaintiff requested that Harrington talk to Fells and ask him to leave her alone. [Ex. 49, pp. 155-56:24-14]. Harrington, of course, reported the Plaintiff's allegations to his supervisors instead. [Ex. 47, p. 13:1-14].

9.      Shortly after the meeting, Harrington contacted his Supervisor, Reginald Green, Associate Dean of Student Services and Administration and also met with LeRoy Pernell, Interim Dean of the College of Law. *Id.* Pernell then directed Harrington to write a formal statement as to what Plaintiff reported to him. Harrington did so and emailed the statement to Pernell. [Ex. 47, p. 13:1-14; Ex. 30].

10.     In Harrington's report, he stated that Plaintiff mentioned that a staff member, which she identified as Orenn Fells, asked her to meet her in a study room in the library. [Ex. 30] Once inside the room, Fells told her that surveillance cameras could not see anything in the study rooms and they could do anything they wanted. *Id.* According the report, Plaintiff stated that she did not want to do anything, but eventually she performed oral sex on Fells. *Id.*

11.     Harrington's report mentions that Plaintiff stated that Fells told her he was responsible for her being admitted into the College of Law ("COL"). [Ex. 30].

12.     Within minutes of receiving Harrington's email, Pernell forwarded it to the University's General Counsel's Office. [Ex. 15].

13.     Less than thirty minutes later, the General Counsel's Office forwarded Harrington's email to Carrie Gavin, the Title IX Coordinator. [Ex. 13].

14.     That same evening, Pernell filed an incident report regarding Plaintiff's allegations against Fells with the University's police department. [Ex. 17].

15.     That night, Gavin began her investigation by interviewing Pernell and informing Pernell's assistant that all library footage from the day of the incident should be preserved. [Ex. 23].

## II.     The University's Response/Investigation

16.     On December 5, 2017, the day after Plaintiff requested that Harrington provide her with counseling services and, reluctantly, told him some of the details about her encounters with Fells, Gavin emailed Plaintiff informing her that she had been notified of Plaintiff's allegations and that the University would be launching an investigation, even though Plaintiff had stated she did not wish to file a complaint. [Ex. 16; Ex. 37].

17.     Gavin asked Plaintiff to provide any communications she had had with Fells, and provide the date of the incident. [Ex. 16; Ex. 37]. She also gave Plaintiff the University's policy regarding discrimination and harassment and a list of resources for reporting her allegations to institutions both in and outside of the University. *Id.*

18.     That same day, Rodner Wright, Interim Provost of the University, issued a letter to Fells that informed him that he was placed on administrative leave effective immediately, pending an investigation into allegations of his misconduct in the workplace. [Ex. 32].

19.     This letter specifically directed Fells to cease all visits, communication and contacts with all students and/or staff. *Id.*

20.     On December 5, 2017, Shashi Persaud, the Executive Director of Administrative Services at the University, reached out to Kenneth Clay, an Officer with the

University police, and Gavin, informing them that the security system at the College of Law overwrites itself around every 2.5 weeks. [Ex. 14]. Persaud provided this information to Gavin because she was seeking to ascertain specific dates and locations regarding when and where the library incident that Plaintiff reported occurred in order to secure the security footage, which would aid in the investigation. *Id.*

21.     On December 6, 2017, Gavin called Plaintiff. During this call Plaintiff told Gavin about Fells' inappropriate texts, the things he asked her for, and the library incident during orientation. [Ex. 19; Ex. 49, p. 165:9-18; p. 166-67:10 - 2]. Plaintiff also told Gavin that Fells mentioned that there were no cameras in the library. [Ex. 49, pp. 166-67:10-2].

22.     During the December 6, 2017 phone call, Plaintiff told Gavin that the library was the only sexual incident that occurred between her and Fells and that it was not consensual. [Ex. 19]. Plaintiff told Gavin that she only had two text messages from Fells on her cell phone. *Id.* Plaintiff, however, did not provide these two text messages to Gavin during the pendency of the investigation.

23.     Gavin once again asked Plaintiff if she wanted to file a complaint, and Plaintiff reiterated that the did not wish to do so. [Ex. 44, p. 51:8-17].

24.     The next day, Gavin continued interviewing witnesses. She spoke with Pernell again and Green. [Ex. 20; Ex. 24].

25.     During Green's interview, he clarified that a panel of faculty members vote on a prospective student's admissions, not Fells, and stated that he knew of no other complaints regarding Fells. [Ex. 20].

26.     During Pernell's interview, he told Gavin that he had heard that Fells had been bragging to others that he knew all the places in the COL not surveilled by cameras. [Ex. 24]. Gavin directed Pernell to get written statements from anyone who could confirm the rumor. [Ex. 24; Ex. 44, p. 60:6-24].

27.     Pamela Leonard, Pernell's assistant, is the individual who informed Pernell that she had heard this rumor. However, Leonard could not recall who had told her this. [Ex. 48, p. 27:12-16; p. 33:14-17].

28.     On December 11, 2017, Gavin and Terrence Davis, the Assistant Director of the Office of Equal Opportunity Programs, interviewed Fells. [Ex. 21; Ex. 22].

29.     During this interview, Fells admitted to having multiple conversations with Plaintiff and to having met Plaintiff in the library. [Ex. 22]. According to Fells, he gave her a book to assist her with legal writing, but no sexual act took place. [Ex. 22; Ex. 51, p. 43:6-11]. He also stated that Plaintiff came by his office on another occasion to pick up flash cards and additional resources. *Id.*

30.     According to Gavin's notes, Fells stated that he did not know anything about the location of surveillance cameras and that he never bragged to colleagues about knowing all of the places in the COL that were not monitored by cameras. [Ex. 22].

31.     Regarding Plaintiff's allegation that he reminded her that he helped get her into law school, Fells stated that his only involvement was assessing her file and giving a recommendation. *Id.* [2]

---

[2] Orenn Fells did not have the ability to admit students into the COL not did he have the ability dis-enrolled from the COL.

32.     On December 12, 2017, Dr. Anika Fields, a licensed psychologist at the Office of Counseling Services at the University, had her first telephonic session with Plaintiff. [Ex. 39]. According to Dr. Fields' notes, Plaintiff did not want to discuss the details of her report of sexual harassment, instead she wanted to discuss the rigors of law school. *Id.*

33.     At the end of the counseling session, Plaintiff indicated that she did not want to schedule a follow up appointment. *Id.* Dr. Fields invited Plaintiff to call if she needed to talk again or needed a referral to a local health clinician. *Id.*

34.     Gavin finished her investigation on February 12, 2018. [Ex. 7]. Based on her investigation, Gavin found the allegations of sexual harassment to be unsubstantiated. *Id.*

35.     After completing her investigation, Gavin sent the investigative report to Rodner Wright, Interim Provost. [Ex. 45, pp. 68-69:17-8].

36.     After reviewing the investigative report and seeing that the allegations were unsubstantiated, Wright consulted with Dean Pernell about when to remove Fells from administrative leave and bring him back to the worksite. [Ex. 50,pp. 7-8:15-10].

37.     Gavin did not provide a copy of the investigative report to Fells or the Plaintiff, because pursuant to the University's policy, Plaintiff, who had not filed a Charge of Discrimination, and did not want to file a Charge of Discrimination, was not considered a complainant. [Ex. 45,p. 69:9-19].

### III.     Follow up contact with EOP by Plaintiff and Others

38.     On March 29, 2018, Jennifer Smith, a professor at the COL, emailed Green, and CC'd Gavin, regarding a locker change for Plaintiff.[3] [Ex. 9]. According to Smith, Plaintiff requested a higher locker so she would not have to bend over while wearing dresses, but she felt that Harrington ignored her request. *Id.*

39.     That same day, Plaintiff received an email from Deborah Holmes, the Coordinator of Student Affairs, who informed Plaintiff that her locker had been reassigned. [Ex. 28].

40.     A few days later, on April 2, 2018, Smith emailed Gavin again regarding Plaintiff. [Ex. 12]. Smith informed Gavin that a student, who she described as untruthful, had told Plaintiff that Harrington knew about Fells' activities before Plaintiff reported them. *Id.*

41.     On May 11, 2018, the University sent Fells a letter informing him that effective close of business Thursday, May 17, 2018, he was no longer placed on administrative leave. [Ex. 25]. Fells returned to the worksite on Monday, May 21, 2018. [Ex. 26].

42.     The College of Law's 2018 Spring semester ended on May 11, 2018 and the 2018 summer semester began on May 21, 2018. [Ex. 35; Ex. 42].

43.     The COL's Student Handbook states "[f]ull-time students placed on Academic Probation at the end of the Fall Semester may not enroll in Summer Session courses." [Ex. 36].

---

[3] Plaintiff contends that she requested the change prior to this email; however, she does not recall when she made the request. [Ex. 49, Plaintiff Dep. p. 255 ¶¶ 8- 17].

44.     Plaintiff was placed on Academic Probation at the end of the Fall 2017 semester. [Ex. 33]. Therefore, she was unable to enroll in summer classes during the Summer 2018 semester per the student handbook.

45.     On May 14, 2018, two days after summer registration had started and a week before summer classes began, Plaintiff emailed Dean Nicky Boothe-Perry, the Associate Dean for Academic Affairs, and asked if she could get credit for her summer internship although she was on academic probation. [Ex. 2].

46.     That same day, Dean Boothe-Perry responded to Plaintiff's email and informed her that per the student handbook, she was unable to receive credit for an internship because she was ineligible to enroll in a summer course since she was on academic probation at the end of the Fall 2017 semester. *Id.*

47.     The next time Plaintiff spoke to Ms. Gavin was on May 22, 2018. During this phone call, Plaintiff shared with Gavin that she was upset that no one at the University informed her that Fells had returned to the worksite. [Ex. 11]. Plaintiff stated that Fells did not speak to her, approach her or physically interact with her. [Ex. 49,pp 201:3-22]. She also informed Gavin that she had messaged Fells a month prior, and called him a "dirty dog" after she found out he was married. *Id.*

48.     During this call, Plaintiff told Gavin that not only did "stuff" happen in the library, but also in the parking garage. *Id.* She also told Gavin that there were other female victims of sexual harassment, but she did not provide their names or any details. *Id.*

49.     The same day that Plaintiff saw Fells at the COL, Plaintiff went to Boothe-Perry's office to ask why Fells' was allowed back to work. [Ex. 49, Plaintiff Dep. pp. 197-99

¶¶ 2-2]. In this meeting Plaintiff also expressed her dissatisfaction with the University Counseling Services. [Ex. 49,p. 199:3-23]. Plaintiff said she was dissatisfied that the counselor wanted to communicate through text.[4] *Id.*

50.     The following day, Gavin emailed Plaintiff a Charge of Discrimination/Harassment Form and asked her if she wanted to file a complaint against Fells. [Ex. 10]. Since Gavin had learned that Plaintiff had contacted Fells the previous month, Gavin asked Plaintiff to provide any text messages or communications in her possession regarding Fells. *Id.*

51.     On May 23, 2018, Smith sent a memorandum to Gavin alleging that she had received messages from other students regarding Fells' conduct. [Ex. 27].

52.     On May 23, 2018, Gavin asked Smith to provide the names of any female students that she knows of that had been victims to sexual harassment by Fells. [Ex. 8]. Smith, however, stated that the students did not feel comfortable sharing their information. *Id.* And Smith did not provide the students' names to Gavin. *Id.*

53.     On March 30, 2018, upon receiving information from Smith that Plaintiff had not heard from any counselors in Orlando, Gavin reached out to Plaintiff advising her to contact Dr. Fields with any concerns she may have. [Ex. 38].

54.     On July 13 2018, after receiving the names of two students from Smith, Gavin emailed the two COL students requesting any information they may have regarding allegations

---

[4] In 2019, Plaintiff sought counseling services outside of the University. She used a service called BetterHelp where patients can either Skype or text with a counselor. [Ex. 49,pp. 284:18-24; Ex. 40].

of sexual harassment by other students against Fells. [Ex. 6]. The students never responded to Gavin. [Ex. 44, p. 41:3-14].

**IV.**      ***Lawsuit***

55.      On July 3, 2018, the University Office of the General Counsel received a Notice of Claim from Plaintiff's counsel. [Ex. 1].

56.      On July 6, 2018, Gavin sent both Fells and Plaintiff a copy of the investigative report. [Ex. 3].

57.      After receiving the investigative report, Plaintiff emailed Gavin and asked why Fells' phone records were not obtained and stated that Harrington's report was inaccurate. [Ex. 4]. Specifically, Plaintiff stated that the oral sex occurred in the parking garage. *Id.* She also mentioned that she never said anything to Fells about not being financially ready for school. *Id.*

58.      Along with this email, Plaintiff sent three screen shots to Gavin: two appear to be from conversations with Fells, and one showing a post and subsequent responses from a social media page. [Ex. 5].

### MEMORANDUM OF LAW

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Wouters v. Martin Cty*, 9 F.3d 924, 928 (11th Cir. 1993). Summary judgment may be granted when the evidence in the record establishes that there is no genuine issue as to any material fact and that the moving party is entitled judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact for trial by showing that there is a lack of evidence to support the non-moving party's case. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Id.* The "mere existence of a scintilla of evidence to support Plaintiff's position will be insufficient . . .." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).

## I.     Plaintiff's Title IX Claims Fail.

Counts I and II of Plaintiff's Third Amended Complaint fail as a matter of law because there are no facts in the record that the University violated Title IX. Title IX provides that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C §1681(a); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280 (1998).

When making a claim for sexual harassment under Title IX, three elements must be met: (1) a plaintiff must identify an "appropriate person" under Title IX; (2) the substance of the actual notice must be sufficient to alert the school official of the possibility of the Title IX Plaintiff's harassment; and (3) the official with such notice must exhibit deliberate indifference to the harassment. *Weis v. Bd. Of Trs. of the Fla. Gulf Coast Univ.*, No. 219CV503FTM29NPM, 2020 WL 2219192, at *5 (M.D. Fla. May 7, 2020) (quoting *Doe v. Sch. Bd. of Broward County*, 604 F.3d 1248, 1254 (11th Cir. 2010)); *see also Kocsis v. Fla.*

*State Univ. Bd. of Trs.*, 788 F. App'x 680 (11th Cir. 2019). The Eleventh Circuit has established that a teacher's sexual harassment of a student constitutes actionable discrimination for the purposes of Title IX. *Sauls v. Pierce Cty. Sch. Dist., 399 F.3d 1279, 1283 (11th Cir. 2005)*; *see also Davis v. Dekalb Cty Sch. Dist.*, 233 F.3d 1367, 1371 (11th Cir. 2000).

Here, Plaintiff's Title IX claims fail as a matter of law because she has not established that once an appropriate person (official) had actual knowledge of her allegations of sexual harassment and abuse, and that an official acted with deliberate indifference. Deliberate indifference is an incredibly stringent standard to meet, and the University's action simply do not arise to that level. Upon notice of the alleged sexual harassment and abuse, Harrington immediately reported it and the University immediately investigated it. Therefore, summary judgment for Count I and Count II should be granted.

      a.     **The University received actual notice on December 4, 2017.**

Actual notice of sexual harassment is a requirement under Title IX; liability may not be based on constructive notice or what the school *should have* known. *See Gebser*, 524 U.S. at 283 (emphasis added). Actual notice is a stringent standard. *Sarver v. Jackson*, 344 F. App'x 526, 530 (11th Cir. 2009). The actual notice must be given to an "appropriate person." *Gebser* 524 U.S. at 289. At a minimum, an appropriate person is an official with the authority to take corrective action to end the discrimination. *Id.* at 290. Binding case law is clear that "the substance of that actual notice must be sufficient to alert the school official of the possibility of the Title IX plaintiff's harassment." *Broward County*, 604 F.3d at 1248; *Weis*, 2020 WL 2219192, at *5.

The University did not have actual notice until December 4, 2017, when Plaintiff met with Harrington to request counseling. During this meeting, Plaintiff told Harrington that an employee had been texting her and asked to meet her in the library in a study room that was obscured from camera surveillance. [Ex. 18]. Plaintiff told Harrington that she told the employee that she did not want to do kiss him or have any sexual interactions with him. She also told Harrington that the employee said he was responsible for getting her admitted into the COL. And after feeling pressured to do so, she performed oral sex on the employee. *Id.*

That same day, the following steps were taken: Harrington reported Plaintiff's claims to his supervisors, Reginald Green and Interim Dean Pernell. Dean Pernell then forwarded Harrington's information to the General Counsel's Office, who then forwarded it to the Carrie Gavin, Title IX Coordinator. According to the University's Non-Discrimination Policy and Discrimination and Harassment Complaint Procedures, Gavin is the appropriate person to bring Title IX complaints to:

> All questions or concerns about this Regulation or conduct that may violate this Regulation should be directed to the Director of Equal Opportunity Programs/Title IX Coordinator:
> Carrie Gavin
> Director of Equal Employment Opportunity Programs/Title IX Coordinator
> Florida A&M University
> 674 Gamble Street
> Tallahassee, Florida 32307
> (850)599-3076
> carrie.gavin@famu.edu

(Ex. 37). Even though, Plaintiff did not directly report her claims to Gavin, and Plaintiff directed Harrington to not disclose her claims to anyone, Harrington disregarded Plaintiff's request, which resulted in Plaintiff's claims being reported to Gavin on the same day the claims were reported to him.

> **b.    The University Did Not Act Deliberately Indifferent to Jane Doe's Report of Sexual Harassment by Orenn Fells.**

"In considering this element, [courts] analyze the conduct of the funding recipient, not the alleged harasser; [courts] do this to ensure that [they] hold the funding recipient liable only if the funding recipient's deliberate indifference 'subjected' the plaintiff to discrimination." *Williams v. Bd. of Regents of Univ. Sy. Of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007) (citing *Davis v. Monroe Cty Bd of Edu.*, 526 U.S. 629, 640–41 (1999)). "The deliberate indifference standard is rigorous and hard to meet." *Hill v. Cundiff*, 797 F.3d 948, 973 (11th Cir. 2015); *Stinson as next friend of K.R. v. Montgomery Cty Bd. of Educ.*, 365 F. Supp. 3d 1233, 1239 (M.D. Ala. 2019) ("The test is 'exacting,' 'rigorous,' and 'hard to meet.'"). "A funding recipient is deliberately indifferent '*only* when [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Doe v. Bibb Cty Sch. Dist.,* 688 F. App'x 791, 797 (11th Cir. 2017) (emphasis added) *See, e.g.*, *Williams*, 477 F.3d at 1296 (Court found that University of Georgia was deliberately indifferent by waiting eight months after the incident to conduct a disciplinary hearing); *Wies*, 2020 WL 2219192, at *8 ("FGCU took no remedial action and did not even conduct an investigation."). The test to determine whether deliberate indifference is the same standard regardless of whether the Title IX claim is teacher-on-student or student-on-student harassment. *Davis*, 526 U.S. at 643.

Only when an official response amounted to an "official decision by the [funding] recipient not to remedy the violation" will it be deemed deliberately indifferent. *Broward Cty*, 604 F.3d at 1259. Stated differently, a university must "official[ly] deci[de] . . . not to remedy the violation" for its response to rise to the level of deliberate indifference. *Id*. At a minimum,

the deliberate indifference must "'cause [students] to undergo' harassment or 'make them vulnerable' to it." *Davis,* 526 U.S. at 645 (internal citation omitted).

Plaintiff reported her allegations of sexual harassment and sexual assault to Harrington in the evening on December 4, 2017. [Ex. 31]. That same evening, Harrington informed his supervisor, Dean Pernell about these allegations. [Ex. 47, p. 13:7-14]. Pernell forwarded Harrington's report to the General Counsel's office, who then forwarded it to Gavin, the Title IX Coordinator. [Ex. 13; Ex. 15]. All of this happened within a matter of hours. During this time, the University also made an incident report with the campus police. [Ex. 17]. Once Gavin received Harrington's report, she immediately started her investigation. She contacted the Plaintiff and informed her of the University's harassment complaint procedures, requested any and all evidence the Plaintiff had, and informed Plaintiff of resources available to her. [Ex. 16; Ex. 23].

The Eleventh Circuit has held that beginning an informal investigation within two days of actual notice is not deliberately indifferent. *Saphir by & through Saphir v. Broward Cty. Pub. Sch.*, 744 F. App'x 634, 638-39 (11th Cir. 2018). Here, the University began its investigation within hours of receiving notice of the Plaintiff's claims. This clearly does not amount to deliberate indifference.

Further, the same evening that Plaintiff reported her claims to Harrington, she received a call from the University's Office of Counseling Services. [Ex. 29]. The following morning, the Interim Provost placed Fells on administrative leave pending investigation of the Plaintiff's claims. [Ex. 32]. While on administrative leave, Fells was directed to cease all visits, communications and contacts with staff and/or students within the COL. *Id.*

While Plaintiff is understandably dissatisfied with the University's actions once it received and investigated her complaint, officials need not adopt a victim's "particular remedial demands" to avoid liability. *Garrett v. Univ. of S. Fla. Bd. of Trustees*, No. 8:17-CV-2874-T-23AAS, 2020 WL 1433059, at *8 (M.D. Fla. Mar. 24, 2020) Additionally, the mere "failure to comply with [federal] regulations…does not establish the requisite actual notice and deliberate indifference." *Gebser*, 524 U.S. at 291–92, 118 S.Ct. 1989; *see e.g., Montgomery Cty. Bd. of Educ.*, 365 F. Supp. 3d at 1241. "[T]he relevant inquiry is not whether the measures taken were effective in stopping discrimination, but whether the [school's] actions amounted to deliberate indifference." *Sauls v.*, 399 F.3d at 1285 (citation omitted). Courts must consider all relevant events and circumstances when determining whether a funding recipient acted with deliberate indifference. *See Hill*, 797 F.3d at 975.

The University's response did not cause Plaintiff to undergo any further harassment or make Plaintiff vulnerable to it. The University conducted a prompt investigation in which Plaintiff's allegations were found to be unsubstantiated. The alleged perpetrator was placed on administrative leave on December 5, the day after Plaintiff made her report and he was directed not to contact any staff or students. During administrative leave and once he returned from administrative leave, which was after the investigation, Plaintiff admitted that he neither communicated with nor tried to contact her.

Plaintiff's claims are supported by after-the-fact analysis that includes a laundry list of remedies that she contends the University *should* have provided her. Specifically, she claims that the University should have done the following: provided a locker change; changed University academic policy so she could receive academic credit; conducted additional witness

interviews, reviewed text messages, and obtained Fells' cell phone records; notified her of the results of the investigation when the investigation was completed; provided in-person counseling services; and notified her that Fells was removed from administrative leave. All these things, however, separately or cumulatively, do not rise to the level of deliberate indifference as Plaintiff admitted that all communication or interactions with Fells ceased once the investigation commenced and she was not exposed to any additional ongoing harassment or damage.

Immediately after Plaintiff reported her claims to Harrington, the University provided her with the counseling that she requested and the University also offered to change the date and time of her exams, which she refused. [Ex. 28; Ex. 49, p. 155-56:2-14]. Plaintiff hangs her hat on the fact that during the Spring 2018 semester, the University allegedly denied her request for an academic accommodation. At all relevant times, the University had no indication that Plaintiff was making this request in relation to her Fall 2017 allegation regarding Fells. Understandably, Plaintiff may have wanted to take summer classes, but it is clear that the school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F. R. § 668.46(b)(11)(v). "Title IX affords a victim of student-on-student sexual misconduct no right 'to demand a particular remedy' and affords the university 'flexibility' and deference in deciding the appropriate response to student-on-student sexual misconduct." *Garrett*, 2020 WL 1433059, at *10 (citing *Davis*, 526 U.S. at 648). Further, when Plaintiff made this request, the Title IX investigation had been finalized and concluded that Plaintiff's allegations were unsubstantiated. Thus, this request was outside the scope of an "interim measure."

In retrospect, it would have been optimum if the University had informed the Plaintiff that the investigation had been concluded.[5] While imperfect, the University's investigation is not violative of any University policy or contrary to any guidance from the Office of Civil Rights. As such, the University's investigation cannot be viewed as "clearly unreasonable in light of the known circumstances." Thus, summary judgment should be granted as to Count II of Plaintiff's Third Amended Complaint.

## II.     Plaintiff § 1983 Claim Fails as a Matter of Law.

Plaintiff alleges the University has a custom or practice of inadequately investigating allegations of sexual harassment and/or assault causing constitutional harm. While §1983 provides a forum for addressing the deprivation of constitutional rights, "it is not itself a source of substantive rights," but instead merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 at n.3 (1979). Thus, at a most basic level to state a claim for relief, a plaintiff must establish they were deprived of a right and that alleged deprivation was committed under color of state law. *American Mfr. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). However, the University is not vicariously liable under § 1983 for the alleged constitutional violations of its employees. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).

Plaintiff contends that the University has a custom or practice of conducting inadequate investigations of sexual harassment and/or assault allegations and that such a custom or

---

[5]However, deliberate indifference "is not a mere 'reasonableness' standard or a failure to use reasonable care standard similar to negligence. *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1287 n.11 (11th Cir. 2003).

practice violated Plaintiff's Constitutional right to bodily privacy. To establish a claim, Plaintiff must demonstrate that the decision to deny her bodily privacy rights was based on an unconstitutional: (1) express policy; (2) a widespread practice that is so well settled and permanent as to constitute a custom; or (3) the act or decision of an official with final policymaking authority. *Llorente v. Demings*, 2016 WL 11455983, at *4 (M.D. Fla. May 16, 2016) (applying *Monell*) (citing *Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966-68 (11th Cir. 2002)).

Here, Plaintiff has failed to establish on the record that there is an express University policy that denied her bodily privacy rights. In fact, there is a University policy that helps to protect a student's bodily privacy rights. [Ex. 37]. There are also no facts in the record to establish that the University has a wide spread practice of inadequately investigating allegations of sexual harassment. Plaintiff bases her accusation of pattern and practice solely on the Fells' investigation.

Prior to her report to Harrington, there had only been one other allegation of sexual harassment at the COL. The alleged perpetrator was terminated after the investigator substantiated the allegations. [Ex. 45, p. 21:2-9; p. 22:21-25]. A single incident is insufficient to indicate a pattern. *Williams v. Fulton Cty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1122 (N.D. Ga. 2016) ("One or two incidents of abuse is generally insufficient to indicate a pattern."). Finally, the record is bare of any support for Plaintiff's claim that an official with final policymaking authority acted or decided to deny Plaintiff of her bodily privacy rights.

Plaintiff obfuscates the record with hearsay evidence of rumors that faculty and staff at the COL had been engaging in sexual harassment and sexual misconduct towards female

students. She uses these rumors as a basis for her claims that the University has a pattern and practice of inadequately investigating claims of sexual harassment. [Ex. 43, pp. 27-28:15-1]. However, notwithstanding the unsubstantiated rumors, no specific incidents and/or names of students were ever reported. Thus, leaving the University without a scintilla of information upon which to launch an investigation. [Ex. 43, pp. 30-31:25-7].

Because there is no record evidence to establish a single element of Plaintiff's claim, summary judgment should be granted.

### III.    Plaintiff's Negligence Claims Fail as a Matter of Fact and as a Matter of Law.

#### a.  Plaintiff's Negligent Training Claim is Barred by Sovereign Immunity.

Plaintiff's negligent training claim is barred by sovereign immunity. *See* Art. X, § 13, Fla. Const. Under Florida common law, State entities, such as the University, are generally immune from liability in tort. § 768.28, Fla. Stat. Florida, however, has a limited waiver of sovereign immunity allowing municipal governments to be sued in tort for any act for which a private person under similar circumstances would be held liable. *See* § 768.28(1) Fla. Stat. (2018); *see also Kaisner v. Kolb*, 543 So. 2d 732, 734 (Fla. 1989); *Seguine v. City of Miami*, 627 So. 2d 14, 17 (Fla. 3d DCA 1993).

Although the State of Florida has waived governmental immunity in certain situations, this waiver does not apply if the challenged governmental acts are "discretionary" rather than "operational." *See* § 768.28(1), Fla. Stat.; *see also Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001); *Kaisner,* 543 So. 2d at 736. An act is "discretionary" if it involves an exercise of executive or legislative power "such that, for the court to intervene by way of tort law would inappropriately entangle it in fundamental questions of policy and planning."

*Guzman v. City of Hialeah*, 2016 WL 3763055, at *5 (S.D. Fla. 2016) (citations omitted). Conversely, an "operational act is one not necessary to or inherent in policy or planning that merely reflects a secondary decision as to how those policies or plans will be implemented." *Id.*

The record evidence is silent as to how the University was negligent in performing any discretionary functions. Instead, Plaintiff's negligent training claim is based solely on her belief that the training provided at the University on investigating and providing supportive measures were inadequate. [Ex. 52, at ¶111]. Because Plaintiff has not alleged operational conduct sufficient to overcome sovereign immunity, her negligent training claim is barred as a matter of law. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) ("to state a claim for negligent training, [plaintiff] must show that Orlando was negligent in the implementation or operation of the program. [Plaintiff] cannot merely challenge the content of the program.").

**b.  Plaintiff's Negligent Training Claim Fails to Make a Prima Facie Case.**

Should the Court determine that Plaintiff's negligence claims must still be heard, the law still favors the University. *Malicki v. Doe*, 814 So. 2d 347, 361 (Fla. 2002). "Negligent training occurs when an employer was negligent in the implementation or operation of the training program." *Gutman v. Quest Diagnostics Clinical Labs., Inc.*, 707 F. Supp. 2d 1327, 1332 (S.D. Fla. 2010) (citing *Mercado*, 407 F.3d at 1162). "[A]s in other negligence causes of action, the conventional elements of duty breach, causation, and damages must be shown in negligent training claims." *Wynn v. City of Lakeland*, 727 F. Supp. 2d 1309 (M.D. Fla. 2010). A plaintiff asserting a negligent training claim must allege that she was harmed as a result of

an employer's failure to adequately train an employee, and that the nature of the employment put the plaintiff in a "zone of risk" such that the employer had a duty running to the plaintiff. *Clary v. Armor Corr. Health Servs. Inc.*, No. 13-90, 2014 WL 505126, at *4-5 (M.D. Fla. Feb. 7, 2014).

From what the University can discern, Plaintiff has alleged that the University failed to adequately train the Title IX Coordinator, Carrie Gavin, to investigate claims of sexual misconduct. [Ex. 52, at ¶ 111]. Nowhere in the record has Plaintiff established the University had a duty to train the Title IX Coordinator. Nowhere in the record has Plaintiff established that the University breached its duty. Nowhere in the record has Plaintiff established that she suffered an injury as a result of this alleged breach. Additionally, there are no facts to support the allegation that Gavin was inadequately trained to investigate Title IX claims. In fact, Gavin testified that she received extensive Title IX training during her tenure as Title IX Coordinator. [Ex. 44, pp. 10-11:21-17]. Plaintiff alleges that she was sexually harassed because Gavin failed to investigate complaints of prior misconduct about Fells. However, Gavin never received complaints regarding Fells' conduct prior to receiving Harrington's report. [Ex. 41]. Accordingly, summary judgment must be granted because Plaintiff has failed to produce any evidence that anyone at the University was negligently trained.

### c. Plaintiff Fails to Make a Claim for Negligent Retention and Supervision.

Negligent retention "occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his

unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." *Garcia v. Duffy*, 492 So. 2d 435, 438-39 (Fla. 2d DCA 1986).[6]

Again, the University received actual notice of Fells' conduct on December 4, 2017. [Ex. 30]. That same day, the University launched an investigation and within 24-hours placed Fells on administrative leave. [Ex. 17; Ex. 23; Ex.32]. It was only after the investigation concluded, which the Plaintiff chose not to participate in within a timely manner, did the Title IX Coordinator determine that Plaintiff's allegations were unsubstantiated. Based upon this conclusion, Fells was removed from administrative leave and returned to the worksite.

Plaintiff argues that the University should have known about Fells' conduct due to Brandy Durham's conversation with Harrington about her self-admitted flirtatious relationship with Fells. [Ex. 43, pp. 16-18:4-20]. Prior to Plaintiff, there had been no reports that Fells had had any nonconsensual relations with students. [Ex. 41].

Further, while witness Brandy Durham admits that she was enamored by Fells' attention and mutually attracted to him, Durham and Fells mutual flirtations with each other is not tantamount to imputing knowledge to the University that Fells would engage in even more nefarious conduct as Plaintiff alleges. Durham submitted a Declaration stating that "[p]rior to the Fall of 2017, I had a meeting with Director of Student Affairs, Harrington, in his office where I mentioned to him that there were many cases of sexual harassment or inappropriate sexual misconduct by FAMU employees toward female law students of FAMU." [Dec. ¶ 6]. In Durham's deposition, she states that she met with Harrington after she started hearing about

---

[6] Under Florida Law, "a negligent supervision claim is analyzed under the same standard as a negligent retention claim." *Grimm v. City of Boca Raton*, No. 15-80608-CIV-MARRA, 2015 WL 4483974, at *8 (S.D. Fla. July 22, 2015) (citing *Mercado*, 407 F.3d at 1162 (11th Cir. 2005)).

the Plaintiff in this case, yet still maintains that the meeting occurred in 2017. [Ex. 43, p. 29:2-12]. However, Plaintiff did not report the alleged harassment until the very end of the Fall 2017 semester. [Ex. 30; Ex. 49, pp. 155-56:2-14]. Durham's timeline is inconsistent with the facts of the case and she only spoke in general terms: failing to name a specific person or incident. [Ex. 43, pp. 27-29:15-1;]. This is insufficient to put the University on notice that Fells was harassing students.

**IV.     Plaintiff Cannot Maintain an Independent Cause of Action for Injunctive Relief.**

The Eleventh Circuit has determined that it is wholly improper to seek injunctive relief without stating the legal basis for entitlement to such relief. *Alabama v. U.S. Army Corps of Eng'rs.*, 424 F.3d 1117, 1127 (11th Cir. 2005). Plaintiff's Third Amended Complaint alleges "[t]his is an action for injunctive relief against FAMU" as the legal basis for Count V. [Ex. 52 at ¶118]. Plaintiff's failure to identify the legal basis entitling her to injunctive relief is fatal to her claim and warrants summary judgment. Additionally, Jane Doe has graduated. Accordingly, Plaintiff's request for reasonable adjustments and accommodations are moot.

<u>CONCLUSION</u>

**WHEREFORE**, based on the foregoing, the University asks this Court to grant summary judgment, on all claims, in its favor.

Dated this 4th day of September, 2020.

Respectfully submitted,

*/s/ Michelle A. Snoberger*
**MICHELLE A. SNOBERGER**
Florida Bar No. 1018204
msnoberger@sniffenlaw.com
**DIANA K. SHUMANS**
Florida Bar No. 675822
dshumans@sniffenlaw.com
**TERRY J. HARMON**
Florida Bar No.: 0029001
E-mail: tharmon@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Attorney for Board of Trustees*
*Florida A&M University*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 4th day of September, 2020, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Middle District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Michelle A. Snoberger*
**MICHELLE A. SNOBERGER**